# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| **ROBERT TETTEH**, *et al.* | : CIVIL ACTION |
| v. | : |
| | : NO. 17-1393 |
| **KATHLEEN BAUSMAN**, *et al.* | : |

**KEARNEY, J.**                                                                                            **May 1, 2018**

## MEMORANDUM

Foreign natives married to United States citizens but denied alien relative status are entitled to know why. Under federal law, the United States must preview or notice its reasons for denying citizenship before final denial so the person seeking relative status can rebut the United States' concerns. When the United States provides notice of some, but not all, reasons for denying alien relative status, we must enforce the fundamental principle of notice and remand to allow the aspiring citizen to challenge the United States' grounds for denying alien relative status.

After divorcing her first husband David Madison, Ghana native Ayishatu Abudu married United States citizen Robert Tetteh in a bona fide marriage. Mr. Tetteh petitioned the United States Citizenship and Immigration Services for alien relative status for Ms. Abudu. Immigration Services denied Mr. Tetteh's petition after finding Ms. Abudu's first marriage to be a sham. The Board of Immigration Appeals dismissed Mr. Tetteh's appeal finding substantial and probative evidence Ms. Abudu and Mr. Madison married to circumvent immigration laws. The Tettehs sued and now move for summary judgment seeking an order declaring Ms. Abudu's first marriage is not fraudulent and the United States violated Mr. Tetteh's due process rights,

and directing the United States to approve the Tettehs' petitions. The United States responds we must deny the Tettehs' summary judgment motion, and grant the United States summary judgment. Most of Mr. Tetteh's objections do not withstand scrutiny given our deference to the Board of Immigration Affairs' findings. But because the United States' final decision relies on derogatory information not earlier disclosed to the Tettehs, we remand to Immigration Services for the limited purpose of allowing the Tettehs to rebut evidence on four issues, outlined below, relied upon in Immigration Services' 2015 denial but not identified in its 2013 notice of intent to deny.[1]

I. **Facts**

A. **Immigration Services denies Ms. Abudu's first petition.**

While attending college in her native Ghana, Ayishatu Abudu met United States citizen David Madison in 2013 on a Washington, D.C. area train.[2] Ms. Abudu and Mr. Madison continued communicating before Ms. Abudu returned to Ghana to complete college.[3] After returning to Ghana, Ms. Abudu and Mr. Madison spoke by phone twice a week and discussed marriage.[4] Ms. Abudu returned to the United States in November 2004 and married Mr. Madison on December 14, 2004.[5]

After their marriage, Ms. Abudu moved in with Mr. Madison who, at the time, resided in the home of a friend in Woodbridge, Virginia.[6] Ms. Abudu and Mr. Madison lived there from November 2004 to September 2005.[7] Ms. Abudu and Mr. Madison moved from the friend's home into an apartment under a two-year lease beginning September 13, 2005 and ending September 13, 2007.[8]

2

Two weeks after marrying Ms. Abudu, Mr. Madison filed an I-130 Petition for Alien Relative on behalf of Ms. Abudu, while Ms. Abudu filed an I-485 Application for Permanent Residence.[9] The United States Citizenship and Immigration Services ("Immigration Services") interviewed Mr. Madison and Ms. Abudu in January and February 2006.[10] Mr. Madison and Ms. Abudu submitted documents supporting Mr. Madison's I-130 Petition.[11]

After considering the interviews and documents, Immigration Services issued a Notice of Intent to Deny Mr. Madison's I-130 Petition in May 2006 ("May 2006 Notice") finding the Abudu-Madison marriage fraudulent.[12] The May 2006 Notice identified specific evidence: discrepancies between Mr. Madison's and Ms. Abudu's interview responses regarding their residence in Virginia beginning in September 2003 and identification cards issued by Virginia showing residence in 2005 and 2006;[13] discrepancies in Mr. Madison's claim he lived in Virginia since September 2003 and information Mr. Madison provided in a biographical form listing his address in Virginia beginning in November 2004 and a Maryland residence from 1972 to November 2004;[14] discrepancies in Ms. Abudu's response she works in a Home Depot located in Maryland and a November 2005 pay stub showing payment of taxes to the State of Maryland, but not to Virginia;[15] Mr. Madison's December 2005 bank statement showing all but one of Ms. Abudu's bank transactions conducted in Maryland;[16] tax returns submitted by Mr. Madison for 2002 and 2003, while a letter from Mr. Madison's mother stated she claimed Mr. Madison as a dependent on her 2004 and 2005 tax returns without evidence of the tax filings;[17] discrepancies in the dates of lease agreements and addresses for Verizon and T-Mobile bills;[18] and, discrepancies between Mr. Madison's and Ms. Abudu's responses to interview questions regarding the hours worked by Mr. Madison, the identity of the voice on the couple's answering

3

machine, when the couple began a sexual relationship, and when Mr. Madison spoke to Ms. Abudu's mother.[19]

The 2006 Notice offered Mr. Madison an opportunity to rebut the derogatory information and submit additional information to support his I-130 Petition.[20] Immigration Services mailed the May 2006 Notice to Mr. Madison at his apartment address in May 2006.[21] The postal service returned the 2006 Notice as undeliverable: "return to sender, attempted – not known, unable to forward."[22]

Plaintiffs contend neither Mr. Madison nor Ms. Abudu ever received the May 2006 Notice, and, consequently, never responded to it. Mr. Tetteh contends he did not "review" the May 2006 Notice until approximately three months ago during this case.[23]

Having heard nothing from Mr. Madison or Ms. Abudu, Immigration Services ultimately denied Mr. Madison's I-130 Petition on November 23, 2009 for the same reasons it articulated in the May 2006 Notice.[24] Mr. Madison, who by that time divorced Ms. Abudu, did not appeal this denial.

### B. Immigration Services learns additional information regarding Ms. Abudu from investigating an Arlington, Virginia marriage fraud ring.

Several months after the May 2006 Notice, the United States charged Eric Amoah with conspiracy to commit immigration fraud and conspiracy to commit money laundering as part of a large-scale marriage fraud ring. The United States contends its investigation into a marriage fraud ring operating in the area of Arlington, Virginia involving immigrants from Ghana revealed Mr. Amoah's identification of the Abudu-Madison marriage as one he arranged for the purpose of gaining immigration benefits for Ms. Abudu.[25] Mr. Tetteh and Ms. Abudu concede "[t]here is some information in the record that Mr. Amoah may have arranged the marriage of

4

Ms. Abudu and Mr. Madison," but dispute Mr. Amoah assisted Mr. Madison in preparing the I-130 petition.[26]

### C. Ms. Abudu marries Robert Tetteh.

Ms. Abudu and Mr. Madison divorced on September 20, 2007.[27] Three months later, on December 15, 2007, Ms. Abudu married Robert Tetteh.[28] In November 2008, Ms. Abudu notified Immigration Services she wanted to "cancel" the I-130 Petition filed on her behalf by Mr. Madison because of their divorce.[29] Mr. Tetteh then filed an I-130 Petition for Ms. Abudu in November 2008. Ms. Abudu filed an I-485 Application for Permanent Residence.[30]

### D. Immigration Services' 2013 Notice of Intent to Deny.

Immigration Services interviewed Mr. Tetteh and Ms. Abudu in August 2009 and April 2012.[31] On January 8, 2013, Immigration Services issued a Notice of Intent to Deny Mr. Tetteh's I-130 Petition ("2013 Notice").[32] The 2013 Notice explained the reasons Immigration Services intended to deny the I-130 Petition: Mr. Amoah assisted in preparing Mr. Madison's I-130 Petition and Ms. Abudu's I-485 application; Mr. Amoah's identification of the Abudu-Madison marriage as one he arranged for purposes of evading immigration laws and securing a permanent resident card for Ms. Abudu; discrepancies in Mr. Madison's and Ms. Abudu's interview responses regarding Ms. Abudu's work schedule, the identity of the voice on the couple's answering machine, when the couple began a sexual relationship; and conflicting documentation submitted by Ms. Abudu regarding her income taxes, residence history, and work history.[33] Based on information received from Mr. Amoah, inconsistent and conflicting testimony of Ms. Abudu and Mr. Madison, and "the other conflicting information submitted by [Ms. Abudu]," Immigration Services found the Abudu-Madison marriage fraudulent.[34]

5

The 2013 Notice afforded Mr. Tetteh thirty days to submit evidence to rebut the intended denial of his I-130 Petition. Mr. Tetteh and Ms. Abudu responded with documents in February 2013 to rebut the findings including Ms. Abudu's affidavit; an affidavit of Michael Adu, a co-worker of Ms. Abudu, who attested to the bona fides of her marriage to Mr. Madison; copies of the leases where Ms. Abudu and Mr. Madison contend they resided together while married; a letter from MetLife Financial Services confirming Ms. Abudu had a life insurance policy naming Mr. Madison as beneficiary; a copy of a letter from a Maryland Home Depot confirming Ms. Abudu's employment there; Ms. Abudu's W-2 forms from Lowe's Home Centers, Inc. and Kmart Corporation in 2005 and 2006; copies of Ms. Abudu's 2005 and 2006 tax returns filed jointly with Mr. Madison; Ms. Abudu's pay stubs from Home Depot; and family photographs of Ms. Abudu and Mr. Madison.[35]

### E. Immigration Services' 2014 Statement of Findings linking the Madison-Abudu marriage to the Arlington marriage fraud ring.

Immigration Services continued investigating Ms. Abudu. On October 30, 2014, Immigration Services prepared a Statement of Findings concluding the Abudu-Madison marriage fraudulent.[36] The investigation into the Arlington marriage fraud ring yielded nineteen similar characteristics. The Statement of Findings found the Abudu-Madison marriage matched thirteen of nineteen identified characteristics of the Arlington marriage fraud ring.[37] The Statement of Findings found Mr. Amoah personally identified the Abudu-Marriage as one he arranged; discrepancies in Mr. Madison's and Ms. Abudu's 2006 interviews in connection with the first I-130 petition including the voice on the answering machine; Mr. Madison's work schedule; whether Mr. Madison met or spoke with Ms. Abudu's mother; and when the couple became

6

sexually intimate; discrepant documentary evidence in leases of the purported marital residences and utility bills; and pay stubs showing Ms. Abudu paid taxes in Maryland, not Virginia.[38]

The Statement of Findings linked the lease to the first marital address notarized by Samuel Owusu-Acheampong and co-owned by James Sakodie, both actors in the Arlington marriage fraud ring; found the lease for second marital address to be fraudulent; found Mr. Madison most likely resided in Maryland during his marriage to Ms. Abudu; and, found Mr. Madison to have children outside of his marriage to Ms. Abudu.[39] The Statement of Findings additionally referred to a November 2014 telephone interview with Mr. Madison who contradicted many of his responses to his 2006 interviews with Immigration Services.[40] All this evidence led Immigration Services to conclude, in its Statement of Findings, fraud in the Abudu-Madison marriage.

### F. Immigration Services' 2015 decision to deny Mr. Tetteh's I-130 Petition and the Board of Immigration Appeals decision.

On January 13, 2015, Immigration Services notified Mr. Tetteh of its decision to deny his I-130 Petition under 8 U.S.C. §1154(c) of the Immigration and Nationality Act (the "Decision").[41] Immigration Services considered documents and testimony of Ms. Abudu and Mr. Madison in 2006, the admission of Mr. Amoah, evidence submitted with the filing of Mr. Madison's I-130 petition, and evidence submitted by Mr. Tetteh in response to the 2013 Notice. Immigration Services reviewed the evidence, explaining the basis of its conclusion. From the evidence gathered in 2006, Immigration Services cites discrepant documents and testimony from Mr. Madison's and Ms. Abudu's 2006 interviews including disagreement on Ms. Abudu's work schedule, the voice on the answering machine, and, when the couple began a sexual relationship; conflicting documentation submitted by Ms. Abudu regarding her income taxes,

7

residence history, and work history; discrepancies in Mr. Madison's biographical information form submitted with the I-130 Petition regarding where and when he resided at identified addresses; bank statements submitted by Ms. Abudu showing all but one transaction made in Maryland; and, a letter from Mr. Madison's mother stating she claimed him as a dependent on her 2004 and 2005 tax returns even though Mr. Madison married Ms. Abudu in December 2004.[42]

From evidence submitted in connection with Mr. Madison's I-130 Petition and evidence submitted by Mr. Tetteh to rebut the 2013 Notice, Immigration Services cites discrepancies in where and when Ms. Abudu and Mr. Madison lived when married; a lease to one purported marital residence notarized by Mr. Owusu-Acheampong, an individual who provided documentary evidence to Immigration Services in connection with the Arlington marriage fraud ring, and co-owned by Mr. Sakodie, an actor in the Arlington marriage fraud ring; bank statements showing nearly all transactions in Maryland, not Virginia, and indicating Ms. Abudu used the bank account primarily for herself, not Mr. Madison, and not used to pay household expenses or evidencing significant financial comingling; discrepancies in Comcast and Verizon bills with regard to the couple's residence; the Home Depot letter confirming Ms. Abudu's employment in Maryland does not support or refute the bona fides of her marriage to Mr. Madison; the life insurance letter, while tending to support the bona fides of the marriage to Mr. Madison, does not require proof of marriage to obtain and is the type of evidence easily created to create the appearance of a bona fide marriage; the assertions in Ms. Abudu's affidavit are at odds with the weight of the evidence in the record and contradict Mr. Madison's November 2014 phone interview denying the couple ever had sexual relations, not just the timing of the couple's

8

sexual relationship as represented in the 2006 interviews; and Mr. Abudu's affidavit, while tending to support the bona fides of the Abudu-Madison marriage, is not sufficient to overcome the derogatory evidence in the record.[43]

After making these findings, Immigration Services in the Decision concluded "there is substantial and probative evidence" of a fraudulent marriage between Ms. Abudu and Mr. Madison "entered into for the primary purpose of evading the immigration laws," citing "(1) [t]he significantly discrepant testimony and evidence submitted by Mr. Madison and [Ms. Abudu] in connection with the first I-130 petition; (2) [t]he insufficient evidence submitted to support that marriage; and (3) [t]he admission by Eric Amoah to USCIS officers and ICE agents that [Ms. Abudu's] prior marriage to Mr. Madison was a fraudulent marriage arranged by Mr. Amoah to circumvent the U.S. Immigration laws."[44] Immigration Services found the "weight of the evidence submitted to support [Ms. Abudu's] marriage to David Madison fails to overcome the substantial and probative evidence indicating that this marriage was a fraudulent 'sham' . . . ."[45]

Mr. Tetteh appealed the Decision to the Board of Immigration Appeals ("Board").[46] On appeal, Mr. Tetteh argued Immigration Services violated 8 C.F.R. § 103.2(b)(16) because he did not have the actual statements from Mr. Amoah and from Mr. Madison's 2014 interview denying him the opportunity to rebut the statements.[47] Mr. Tetteh did not challenge the sufficiency of the evidence. He also did not raise five of the six challenges to Immigration Services' reliance on evidence not included in the 2013 Notice but which he now presents to us. The United States declines to argue waiver after we asked it for supplemental briefing on whether Mr. Tetteh waived challenges to the 2015 Decision based on information not included in the 2013 Notice.[48]

9

After considering the briefing, and applying a *de novo* review to the record, the Board found Mr. Tetteh did not meet his burden of proving the bona fides of the Abudu-Madison marriage, and dismissed the appeal.[49] Mr. Tetteh moved to reconsider the Board's decision where he raised one of the four grounds relied upon in the Decision but not included in the 2013 Notice.[50] The Board denied his motion for reconsideration.[51] The Tettehs then filed this case.

## II. Analysis

The Tettehs seek summary judgment arguing Immigration Services: (a) denied procedural due process by violating its own regulations by relying on evidence supporting its 2015 Decision not included in the 2013 Notice; (b) denied Mr. Tetteh's substantive due process right to right to marry Ms. Abudu without being separated by "a government decision"; (c) violated equal protection under the Fifth and Fourteenth Amendments through 42 U.S.C. § 1985(3); and (d) the Decision affirmed by the Board is arbitrary and capricious and violates the Administrative Procedures Act (the "Act").[52] In response, the United States argues its final decision is not arbitrary, capricious, or an abuse of discretion, and there is no merit to Mr. Tetteh's due process claims. The United States asks we deny the Tettehs' motion for summary judgment and enter judgment in favor of the United States.

When we review an agency's decision under the Act, we "sit[] as a an appellate tribunal and the usual summary judgment standard does not apply."[53] Under the Act, we "may only hold unlawful and set aside agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise accordance with the law.'"[54] "This is a 'deferential standard' that 'presume[s] the validity of agency action.'"[55] Our scope of review under the arbitrary and capricious standard is "narrow" and we do not substitute our own judgment for that of the agency.[56] We do not "re-

10

weigh the evidence presented but must determine only if "a reasonable mind might accept [the evidence] as adequate to support a conclusion."[57] Agency action is arbitrary and capricious where "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in the view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given."[58]

If we find error in an agency's judgment, "reversal or remand is warranted only when the error actually prejudices the party."[59] We must determine whether the agency's error is harmless.[60] "[A]n agency's failure to follow its procedural rules may be grounds for reversal when it results in prejudice or the denial of a party's rights."[61]

## A. The Immigration and Nationality Act prohibits sham marriages to obtain alien relative status.

The Immigration and Nationality Act prohibits the approval of I-130 petitions if "(1) the alien has previously been accorded, or has sought to be accorded, an immediate relative or preference status as the spouse of a citizen of the United States or the spouse of an alien lawfully admitted for permanent residence, by reason of a marriage determined by the Attorney General to have been entered into for the purpose of evading the immigration laws, or (2) the Attorney General has determined that the alien has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws."[62]

Immigration Services will deny an I-130 petition where there is "substantial and probative evidence" of an "attempt or conspiracy" to enter into a marriage for the purpose of

11

evading immigration laws.[63] When the record shows substantial and probative evidence, "the burden shifts to the petitioner to establish that the beneficiary did not seek . . . preference status based on a prior fraudulent marriage."[64]

Mr. Tetteh concedes it is his burden to establish his wife Ms. Abudu did not earlier seek alien relative status based on a fraudulent marriage. We must address whether Immigration Services complied with the Law in specific findings of a fraudulent marriage without offering prior notice of these possible findings.

### B. We remand for compliance with 8 C.F.R. § 103.2(b)(16).

Section 103.2(b)(16) requires Immigration Services to permit an applicant or petitioner "to inspect the record of proceeding which constitutes the basis for the decision, except as provided in the following paragraphs. (i) Derogatory information unknown to petitioner or applicant. If the decision will be adverse to the applicant or petitioner and is based on derogatory information considered by the Service and of which the applicant or petitioner is unaware, he/she shall be advised of this fact and offered an opportunity to rebut the information and present information in his/her own behalf before the decision is rendered except as provided [in paragraphs not applicable here]. Any explanation, rebuttal, or information presented by or in behalf of the applicant or petitioner shall be included in the record of the proceeding."[65]

The Tettehs argue Immigration Services relied on six factual findings in its 2015 Decision which were not included in the 2013 Notice and which is unknown to them: (1) referring to bank statements to find all transactions were conducted in Maryland; (2) information regarding the identity of the voice on the Abudu-Madison answering machine; (3) reference to Mr. Madison's mother's letter asserting she claimed him on her 2004 and 2005 taxes; (4) the

12

2014 Statement of Findings including Mr. Amoah's identification of the Abudu-Madison marriage as one he arranged for the purposes of evading immigration laws; (5) the Woodbridge, Virginia residence where Ms. Abudu and Mr. Madison asserted they first resided as a married couple is co-owned by James Sakodie, an actor in the Arlington marriage fraud ring; and (6) the November 2014 telephone interview with Mr. Madison.[66]

The United States responds the Tettehs do not allege or show "substantial prejudice" as a result of the "late disclosure," surmising it is "likely because [the Tettehs] either were aware of the relevant facts, or could not dispute them regardless of when they were advised of such facts."[67]

A comparison of the 2015 Decision with the 2013 Notice shows there is derogatory information considered by Immigration Services not included in the 2013 Notice: bank statements showing all of Ms. Abudu's transactions occurred in Maryland; reference to Mr. Madison's mother's letter she claimed him on her 2004 and 2005 taxes; co-ownership of Abudu-Madison's first marital residence by James Sakodie, actor in the Arlington marriage fraud ring; and Immigration Services' November 2014 telephone interview with Mr. Madison.[68] For example, the 2013 Notice did not reference information the agency gathered from Mr. Madison's 2014 telephone interview; it could not have because the interview occurred after the 2013 Notice. In Mr. Madison's 2014 telephone interview, the agency contends Mr. Madison admitted he never consummated his marriage with Ms. Abudu, a reversal of his 2006 interview responses admitting he had a sexual relationship with Ms. Abudu but providing a different timing than Ms. Abudu on when they began such relations. Immigration Services' 2015 Decision relies, in part, on a finding of discrepancies between Ms. Abudu's Affidavit explaining the timing of her sexual

13

relationship with Mr. Madison and Mr. Madison's 2014 statements he never had sexual relations with Ms. Abudu. Similarly, the 2013 Notice did not contain information gathered by the agency in its Statement of Finding created in October 2014, after it issued its 2013 Notice. Information in the Statement of Finding includes the identification of Mr. Sakodie as co-owner of the Woodbridge, Virginia apartment where Ms. Abudu contends she first lived with Mr. Madison. The Decision relies, in part, on Mr. Sakodie's involvement in the Arlington marriage fraud ring as identified by Mr. Amoah. The particular information about Mr. Sakodie is not included in the 2013 Notice.

The 2013 Notice did not include information gathered by Immigration Services in 2014, as required by § 103.2(b)(16). Consequently, the Tettehs could not rebut this information before Immigration Services issued the 2015 Decision. Immigration Services failed to conform to the law on this one issue.[69]

We disagree with the United States the Tettehs failed to allege or show prejudice; the Tettehs argue the omission of information from the 2013 Notice deprived them of the opportunity to rebut evidence relied on in the 2015 Denial. We are not persuaded by the United States' argument the Tettehs did not allege or show prejudice "likely because they either were aware of the relevant facts, or could not dispute them regardless of when they were advised of such facts." The Tettehs could not have rebutted information gathered by Immigration Services in 2014 from Mr. Madison's telephone interview and Mr. Sakodie's ownership of the first Abudu-Madison marital apartment. The Tettehs contend they were not aware of this information. The United States does not specifically address the gap between the 2013 Notice and 2015 Decision, arguing instead the Tettehs did not show substantial prejudice. As our

14

colleague Judge Sánchez recently found prejudice construing the same regulation, "[a]n opportunity to rebut the Agency's credibility finding could have had the effect of tipping the scales . . . ."[70]

There is no dispute § 103.2(b)(16) required Immigration Services to advise the Tettehs of derogatory information, of which the Tettehs were unaware, and "offered an opportunity to rebut" it before the agency rendered its 2015 Decision. Immigration Services did not follow, at least in part, the regulation here. Accordingly, we remand this action to Immigration Services to reopen Mr. Tetteh's I-130 petition solely to allow the Tettehs the opportunity to rebut the derogatory information we identified here contained in the 2015 Decision but not contained in the 2013 Notice.[71] With this incomplete record, we cannot decide whether the 2015 Decision by Immigration Services and the Board's decision after *de novo* review of the record is arbitrary and capricious under the Act.

## III. Conclusion

In the accompanying order, we remand for the limited purpose only to allow the Tettehs to offer reasons and evidence to the Board and Immigration Services to rebut four findings in the 2015 Decision: (1) reference to bank statements to support a finding all transactions were conducted in Maryland; (2) reference to Mr. Madison's mother's letter asserting she claimed him on her 2004 and 2005 taxes; (3) the Woodbridge, Virginia residence where Ms. Abudu and Mr. Madison asserted they first resided as a married couple is co-owned by James Sakodie; and (4) the November 2014 telephone interview with Mr. Madison.

[1] Mr. Tetteh and Ms. Abudu sued each United States officer in an official capacity: Kathleen Bausman, Field Office Director of the United States Citizenship and Immigration Services in Philadelphia; Elaine Duke, Secretary of the Department of Homeland Security; and James McCament, Acting Director of the United States Citizenship and Immigration Services (collectively the "United States").

[2] Administrative Record ("AR") at 31.

[3] *Id.*

[4] *Id.*

[5] *Id.* at 32.

[6] *Id.*

[7] *Id.* at ¶ 5.

[8] AR 253. Where, and when, Ms. Abudu and Mr. Madison resided after marriage is disputed and discrepancies in the couple's residence are one of the bases of Immigration Services' decision to deny Mr. Tetteh's I-130 Petition he filed on behalf of Ms. Abudu.

[9] AR 248, 250-51.

[10] AR 232.

[11] AR 233.

[12] AR 232.

[13] *Id.*

[14] AR 233.

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*

[19] *Id.*

[20] AR 234.

[21] AR 231.

[22] *Id.*

[23] Plaintiffs' Motion for Summary Judgment at 4 n.2 (ECF Doc. No. 27).

[24] AR 228-230.

[25] AR 211.

[26] ECF Doc. No. 27 at 8.

[27] AR 181-182.

[28] AR 197.

[29] AR 33 at ¶ 14; 81; 114.

[30] AR 193-94.

[31] ECF Doc. No. 7 at ¶ 25.

[32] AR 113-115.

[33] AR 114.

[34] *Id.*

[35] AR 111-112.

[36] AR 200-210.

[37] AR 202-203.

[38] AR 205.

[39] AR 204-207.

[40] AR 207-209.

⁴¹ AR 101-107.

⁴² AR 103-104.

⁴³ AR 105-106.

⁴⁴ AR 106-107.

⁴⁵ AR 107.

⁴⁶ AR 78.

⁴⁷ AR 97-99.

⁴⁸ ECF Doc. No. 32, p. 3 ("For purposes of this case, based on these facts only, and in light of the fact that the [Board] engaged in a full *de novo* review of the record despite Plaintiffs' failure to raise all possible arguments, Defendants are not advancing the argument that Plaintiffs waived the right to make arguments on appeal to the District Court."). We are not persuaded the Board's *de novo* review cures the notice issue. The Board's *de novo* review does not mean the Tettehs addressed these issues; to the contrary, the Tettehs presented the Board with only one of the six findings in the Decision not raised in the 2013 Notice. But Defendants do not argue this apparent waiver. And we will not *sua sponte* base a summary judgment decision premised on waiver without evidence when the Defendants specially concede they are not arguing waiver.

⁴⁹ AR 52-54.

⁵⁰ AR 15-41.

⁵¹ AR 4-5.

⁵² 5 U.S.C. § 701 *et seq.*

⁵³ *Singh v. Holder*, No. 14-7063, 2015 WL 7888711, at * 2 (E.D. Pa. Dec. 2, 2015) (citing *Uddin v. Mayorkas*, 862 F.Supp. 2d 391, 399 (E.D. Pa. 2012)).

⁵⁴ *Dorley v. Cardinale*, 119 F.Supp.3d 345, 352 (E.D. Pa. 2015) (quoting 5 U.S.C. § 706(2)(A)).

⁵⁵ *Singh*, 2015 WL 7888711, at *2 (quoting *SBS Inc. v. F.C.C.*, 414 F.3d 486, 496 (3d Cir. 2005)).

⁵⁶ *Mirjan v. Att'y Gen.*, 494 F.App'x 248, 250 (3d Cir. 2012) (quoting *CBS Corp. v. F.C.C.*, 663 F.3d 122, 137 (3d Cir. 2011)).

⁵⁷ *Smith v. Holder*, 487 F. App'x 731, 733 (3d Cir. 2012).

⁵⁸ *Mirjan*, 494 F.App'x at 250 (quoting *CBS Corp.*, 663 F.3d at 137).

⁵⁹ *Jessop v. Johnson*, No. 16-1232, 2017 WL 2957820, at *3 (E.D.Pa. July 10, 2017) (citing 5 U.S.C. § 706).

⁶⁰ *Id.* (quoting *U.S. v. Reynolds*, 710 F.3d 498, 514 (3d Cir. 2013)).

⁶¹ *Id.* (citing *Connor v. U.S. Civil Serv. Comm'n*, 721 F.2d 1054, 1056-57 (6th Cir. 1983)).

⁶² 8 U.S.C. § 1154(c).

⁶³ 8 C.F.R. §204.2(a)(1)(ii). The subsection provides in full "Section 204(c) of the Act prohibits the approval of a visa petition filed on behalf of an alien who has attempted or conspired to enter into a marriage for the purpose of evading the immigration laws. The director will deny a petition for immigrant visa classification filed on behalf of any alien for whom there is substantial and probative evidence of such an attempt or conspiracy, regardless of whether that alien received a benefit through the attempt or conspiracy. Although it is not necessary that the alien have been convicted of, or even prosecuted for, the attempt or conspiracy, the evidence of the attempt or conspiracy must be contained in the alien's file."

⁶⁴ *Matter of Kahy*, 19 I. & N. Dec. 803, 807, 1988 WL 235464, at *3 (Nov. 23, 1988).

⁶⁵ 8 C.F.R. §103.2(b)(16)(i).

⁶⁶ ECF Doc. No. 27 at 21-22.

⁶⁷ ECF Doc No. 28 at 21-22.

⁶⁸ We disagree with the Tettehs the 2013 Notice did not include derogatory information regarding discrepancies with the identity of the voice on the Abudu-Madison answering machine and the identification of the Abudu-Madison marriage as fraudulent by Mr. Amoah. The 2013 Notice included both these pieces of evidence. *See* AR 114. We additionally note the 2006 Notice included information regarding the bank statements and Mr. Madison's mother's letter regarding taxes. *See* AR 233. However, the Tettehs assert they never received the 2006 Notice sent to Mr. Madison, returned as undeliverable, until the production of the Administrative Record in this litigation in February 2018. The United States does not contend otherwise.

⁶⁹ *Jessop*, 2017 WL 2957820, at *8.

⁷⁰ *Id.* at 9.

---

[71] Our decision today is limited solely to the issue of notice and an opportunity to rebut derogatory information under 8 C.F.R. § 103.2(b)(16). We do not address the Tettehs' argument they are entitled to the actual documents relied on by Immigration Services rather than a summary, and their substantive due process and equal protection arguments, although we do not envision those arguments as ultimately succeeding.